**IMC CHEMICALS, INC., f/k/a North American Chemical Co.,**
**Plaintiff,**

v.

**NIRO, INC., Defendant and Third–Party Plaintiff,**

v.

**DEC International, Inc., Third–Party Defendant.**

**No. 98–2348–JTM.**

United States District Court,
D. Kansas.

April 27, 2000.

Floyd R. Finch, Jr., Blackwell Sanders Peper Martin LLP, Kansas City, MO, Tara E. Foss, Foland & Wickens, P.C., Kansas City, MO, for IMC Chemicals, Inc.

Samuel P. Logan, James K. Logan, Logan Law Firm LLC, Olathe, KS, E. Hutchinson Robbins, Jefferson V. Wright, Miles & Stockbridge P.C., Baltimore, MD, for Niro, Inc.

Brett C. Coonrod, Spencer J. Brown, Deacy & Deacy, Kansas City, MO, David Easton, Michael J. Modl, Andrew J. Clarkowski, Axley Brynelson, LLP, Madison, WI, for DEC Intern., Inc.

## MEMORANDUM ORDER

MARTEN, District Judge.

Currently before the court in this action involving a dispute as to the construction of industrial fluid bed dryers for the production of soda ash are (1) the summary judgment motion by defendant Niro, Inc., seeking dismissal of the claim for consequential damages by plaintiff IMC Chemicals, Inc., (2) IMC's motion to amend its complaint, which would allow the introduction of fraud and fraudulent inducement claims against Niro, and (3) a summary judgment motion by third-party defendant DEC International, Inc. For the reasons stated herein, the court will deny the first motion, grant the second, and grant—in most respects—the third.

### 1. Niro's Motion for Summary Judgment

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the sum-

mary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The evidence before the court establishes that on April 2, 1993, IMC and Niro entered into a $21.8 million contract "for the design, engineering and fabrication of process system equipment" for manufacturing soda ash "as set forth on exhibit A attached hereto." (Def.Exh. A, at 165–49). Exhibit A specifies the completion of the process system equipment by phases, with an associated capacity to produce light or dense soda ash at a given number of tons per hour. Section VII of the preliminary, typewritten portion of the contract provides in part that "Niro guarantees the evaporation rate for all drying equipment as shown in the technical description Section 1.1.2 'Process Conditions', and all equipment delivered hereunder shall be in conformance with the technical description that follow[s]." (Id. at 165–54).

Attached as an appendix to the typewritten portion of the April 2 contract is a printed "General Terms and Conditions" form containing standard contract provisions used by Niro Atomizer, Inc.[1] As incorporated into the contract in question, Section V of the General Terms and Conditions of the Contract provides Niro's warranty terms. It provides:

> [Niro] warrants to the Purchaser that the equipment purchased is free from defects in material and workmanship for a period of twelve (12) months from the date of delivery of the equipment provided that: (a) the equipment is installed in accordance with [Niro]'s specifications and instructions and is used and maintained normally and properly in accordance with [Niro]'s instructions as to maintenance and operations, whether given orally or set forth in written operations and maintenance manuals and instruction sheets furnished by [Niro]; (b) the equipment is used in connection with product consistent with the Purchaser's specifications to [Niro] or, if no specifications are given, with the material identical to material provided to [Niro] for testing prior to this proposal; (c) the equipment has not been changed without the prior written approval of [Niro]; (d) Purchaser gives prompt written notice to [Niro] before the end of the warranty period specifying as alleged defects in the equipment purchased; and (e) Purchaser preserves and turns over to [Niro] or permits reasonable inspection by [Niro] of all allegedly defective equipment, parts or items. This warranty shall not cover (i) any equipment furnished by Purchaser or any third party (other than a subcontractor of [Niro] ), (ii) any defects arising from corrosion, use of unsuitable lubricants, or negligent attendance or faulty operation, or (iii) any defects caused by errors on the part of the Purchaser in not providing suitable premises in which the equipment is to be located, adequate foundation works, or adequate protection against influences within or outside the premises which may affect the equipment or its operation.
>
> If the Purchaser discovers a defect during installation of the equipment, Purchaser is to advise [Niro] as soon as possible· after a problem is detected by telephone, followed by written confirmation, telecopy, telex, etc., giving detailed information of the alleged defect and the reason that it is considered [Niro]'s responsibility. In addition, Purchaser shall provide details to include projected direct costs and delays (number of people, rental equipment, etc.), if any, which may result from such alleged defect. [Niro] and Purchaser will then

---

1. Section VII of the typewritten Terms and Conditions portion of the contract states: "in the event of a conflict between the terms and conditions of this contract and Niro Inc. 'General Terms and Conditions', the terms and conditions of this contract shall control."

mutually agree to a reasonable response time. [Niro] will have access to the job site to inspect and review with the erection contractor and Purchaser's personnel when [Niro] feels justified to make such a visit. Backcharges will not be accepted by [Niro] unless [Niro] has authorized such charges prior to commencement of work, except for charges incurred to prevent an emergency; i.e., personnel safety or an occurrence of imminent hazard, etc. If the emergency charges occur, Purchaser will document the incident and submit the details to [Niro] for review. When responsibility for outstanding backcharges cannot be resolved by normal channels, periodic meetings will be held as required to resolve the differences.

UNLESS OTHERWISE EXPRESSLY STATED IN ANY DOCUMENT ATTACHED TO THESE GENERAL TERMS AND CONDITIONS, THIS WARRANTY OF MATERIAL AND WORKMANSHIP IS THE ONLY WARRANTY MADE BY [NIRO] AND IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, AND [NIRO] DISCLAIMS ON BEHALF OF ITSELF, ITS SUBCONTRACTORS AND SUBSUPPLIERS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A SPECIFIC PURPOSE, SUITABILITY OR PERFORMANCE. No other promise or affirmation of fact (including, but not limited to, statements regarding capacity or performance of the equipment) shall constitute a warranty of [Niro] or give rise to any liability or obligation on the part of [Niro].

[Niro]'s obligation under this warranty and any other warranty or guarantee attached to these General Terms and Conditions is strictly and exclusively limited to furnishing repairs or replacements for equipment or parts determined to be defective on inspection by an authorized representative of [Niro]. [Niro] assumes no responsibility and shall have no liability for any repairs or replacements by Purchaser without [Niro]'s prior written authorization.

(Def.Exh. A., at 165–57).

Section VI of the General Terms and Conditions provides a limitation on the damages available under the contract:

NOTWITHSTANDING ANY OTHER PROVISION OF THIS PROPOSAL OR ANY RESULTING CONTRACT TO THE CONTRARY, (A) [NIRO]'S AND ITS SUBCONTRACTORS' AND SUBSUPPLIERS' AGGREGATE RESPONSIBILITY AND LIABILITY, WHETHER ARISING OUT OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, UNDER THIS PROPOSAL OR RESULTING CONTRACT, INCLUDING, BUT NOT LIMITED TO, ALL CLAIMS FOR BREACH OF ANY WARRANTY OR GUARANTEE, FAILURE OF PERFORMANCE OR DELAY IN PERFORMANCE BY [NIRO] OR PERFORMANCE OR NON–PERFORMANCE OF THE PURCHASED EQUIPMENT SHALL NOT EXCEED FIFTY PERCENT (50%) OF THE CONTRACT PRICE FOR THE PURCHASED EQUIPMENT, AND (B) IN NO EVENT SHALL [NIRO], ITS SUBCONTRACTORS OR SUBSUPPLIERS BE LIABLE IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER, INCLUDING, BUT NOT LIMITED TO, LOSS OF USE OF PRODUCTIVE FACILITIES OR EQUIPMENT, LOSS OF PROFITS OR PRODUCTION, LOSS OF REVENUE OR USE OF REVENUE, PLANT DOWN TIME, PROPERTY DAMAGE, OR EXPENSES OR DAMAGES INCURRED IN RELIANCE ON [NIRO]'S OR ITS SUBCONTRAC-

TORS' OR SUBSUPPLIERS' PERFORMANCE OR NON–PERFORMANCE HEREUNDER, WHETHER SUFFERED BY A PURCHASER OR ANY THIRD PARTY, OR FOR ANY LOSS OR DAMAGE ARISING OUT OF THE SOLE OR CONTRIBUTORY NEGLIGENCE OF THE PURCHASER, ITS EMPLOYEES OR AGENTS OR ANY THIRD PARTY.

(Id.)

IMC set specifications for performance, including ASME Code compliance, 98% onstream time, and a 20–year life service. These requirements were material to IMC.

In responding to the request for bids, Niro wrote:

In reviewing your specification, there were a number of guarantees you required. In principle, we concur with these and have designed the system to meet each of them. We would like, however, to discuss a few of them and establish a protocol for acceptance before writing such guarantees into our proposal.

(Plf.Exh.7). Subsequently, however, Niro and IMC did not reach any agreement on the guarantees or attempt to establish a "protocol for acceptance." Niro did not intend to comply with the performance specifications set out by IMC. It did not reveal this intention to IMC.

In its marketing, Niro has held itself out as "the undisputed world leader in drying technology." (Plf. Fact ¶ 23).

In its response to the motion for summary judgment, IMC cites the deposition of its engineer Jim Fairchild. Fairchild states that IMC—in order to see if fluid bed technology worked—contracted with Niro to run fluidization tests at Niro's Columbia, Maryland laboratory in December, 1991. When one of the tests was unsuccessful, Fairchild asked Niro engineer Erik Liborius about the process. Liborius told Fairchild that the failure was only a start up condition, and that Niro's patented spreader would solve any prob-

lems. There is a fact dispute as to what Niro represented about the need for future testing. According to Fairchild, Liborius told him that a pilot plant was not needed to demonstrate the feasibility of fluid bed technology. Niro has introduced testimony that it pushed for a pilot plant, but that this was rejected by IMC.

Niro does not contest the existence of representations that Niro's products were effective and would achieve even distribution (Plf. Fact ¶¶ 27, 29, 31, 36, 37). Niro knew IMC was concerned about the questions of even distribution and the design of the spreader (Plf. Fact ¶ 30). Niro does not controvert evidence indicating reliance by IMC upon these representations. (Plf. Fact ¶ 38). The spreader was one of the key reasons IMC chose Niro to provide the required equipment. Niro does stress that the fluid bed technology was newly developed, and that the resulting dryer equipment would be "the first of their type in the world." (Def. Reply at 7, citing Exh. M).

According to IMC's response, Niro in fact was entertaining ongoing doubts about the feasibility of fluid bed technology. It cites a February 14, 1992 memo by Liborius stating that "Niro's present generation of rotary distributors [spreaders] is considered unsuitable for plants" such as IMC's, and asked for support from Niro–Denmark because "our technology . . . has been openly questioned." (Plf.Exh.6). Niro responds to this by again stressing the novelty of the technology, acknowledging that there were "some challenging engineering issues" associated with the technology. (Def. Reply at 7).

There is a dispute between the parties as to the interpretation of a 1992 memorandum by Niro Manager of R & D Systems and Design Engineering Christian Schwartzbach. Niro correctly notes that the particular engineering question at issue in this memo was not the product spreader, but a response to another memo by engineer Poul Kofoed Jensen, which dealt with the product distributor. None-

theless, the memo indicates that Schwartzbach was concerned with the general question of lump disintegration, and that the complete process was untested. He wrote that "[i]n the short term it is essential for us to convince the customer that we know how to handle such a complicated process and design problem. Maybe the best approach would be to stick to Poul's concept and keep my concerns behind closed doors." (Plf.Exh.10).

Following expressions of concern by IMC about feasibility, Niro representative Fred Shaw wrote to Niro–Germany that Niro was in "a desperate search for a fluid bed reference plant" to demonstrate the technology since IMC "is concerned with plugging or sticking in the fluidizing gas heater and gill plate" and is "also skeptical of the reliability of the wet cake feeder." (Plf.Exh.11).

Ultimately there was a demonstration of the technology at a pilot plant in Green River, Wyoming in the fall of 1992. The parties disagree as to the results of this testing. IMC cites internal Niro documents indicating that the spreader did not function properly. Niro, without citing evidence, asserts that the pilot plant "initially did not perform to [its] complete satisfaction," but was ultimately successful and sold to another company. (Def. Reply at 8–9).

IMC also cites an internal April 21, 1995 memorandum by a Niro engineer following a rebuilding of a bicarbonate fluid bed. The memo states:

> The main problem in the drying tests [was] formation of lumps in the wet material. It was believed, that this problem could be solved by a feed distributer of novel design[.] We may later have convinced the customer that all problems could be solved by a sophisticated feed distributor.

(Plf.Exh.16). Niro states that the memo speaks for itself. (Reply, at 9). However, it also stresses that part of the memo which states that "The lack of design data for the drying of bicarbonate was known by the customer. The design was Niro's responsibility but in light of joint venture discussions, it may not be unfair to claim that [IMC] should contribute to some of the development costs involved." (Plf.Exh.16).

In June of 1995, Niro Project Manager Lou Latimer wrote that the "reliability and performance of the feed distributors so far has been less than satisfactory." (Plf.Exh.17).

Niro felt at first that the arrangement with IMC was worth "approximately $16.8 million" to Niro. After the 1992 agreement in principle, Niro anticipated a potential profit of $5 to $7 million on its contract with IMC.

The ASME Code is a reference work and fabrication guideline that is considered authoritative in the pressure vessel industry. It is good engineering practice in the construction of heat exchangers to require compliance with the code. It is uncontroverted that IMC's specifications for the monohydrate and bicarbonate dryers required code compliance. It is uncontroverted that IMC's engineers relied on Niro to determine how the requirements of the ASME Code applied to the tube bundles. In responding to IMC's bid request, Niro did not object to the specifications that the dryers meet ASME Code. Niro's original drawings for the proposed tube bundles, prepared in November 1992, bore the legend "ASME CODE STAMP AND INSPECTION REQUIRED." (Plf.Exh.23). Niro specified that the tube bundles were to be ASME Code stamped. IMC received a copy of these specifications for review and comment. According to IMC, when it signed the 1993 contract, it expected to receive tube bundles that complied with ASME Code.

In its reply, Niro stresses that the requirement of ASME Code compliance was not formally a part of the 1993 contract. It also notes that IMC did not seek to have the ASME Code formally made a part of the contract.

According to IMC, Niro's bid price was based upon a quotation from Elliot & Associates, a company which was not approved for ASME Code work and which was later eliminated from consideration as a subsupplier because of schedule and quality concerns. Instead, Niro received a bid from DEC in February 1993. From that bid, Niro discovered that it had substantially underestimated the cost to purchase code-compliant tube bundles. DEC's bid was 167% of what Niro had budgeted for the tube bundles. Niro's management directed its purchasing department to demand "deep discounts" from suppliers, expecting that "every vendor [will] cut into their margin" to help Niro "make up" the anticipated $3.8 million in lost margin. (Plf.Exh. 34, at 5).[2]

Eventually, Niro decided to drop the requirement that the tube bundles be ASME Code stamped. The parties disagree as to when IMC learned of this decision. According to IMC, it first learned the bundles would not be code stamped when it received a set of plans several weeks after the contract was signed. Niro asserts that Jim Fairchild of IMC agreed to the procedure, citing the deposition testimony of Alexander Hagi–Duvan. (Def. Reply Exh. X). However, the deposition excerpt indicates that Hagi–Duvan by his own admission has little independent recollection of these events: "I do not recall very clearly what had taken place, and I can only speculate by recognizing my own handwriting and by also knowing how I do my job. . . ." (Id., at 108).

Shortly before the contract between IMC and Niro was signed, on March 30, 1993, Niro scheduled a meeting with DEC to negotiate a lower bid. During these negotiations, various requirements which would have ensured code compliance were dropped. In particular, DEC was relieved of the responsibility to perform any design work. Niro did not reveal these changes to IMC, or that it was seeking to force suppliers to cut costs to make up an anticipated shortfall.[3] Niro never told IMC that it had relieved DEC of all design responsibilities.

On May 3, 1993, Jim Rodosevich of IMC wrote to Niro in response to drawings which stated that the tube bundles did not require a code stamp. Rodosevich wrote that not stamping "may be appropriate since the tube bundles are probably considered boiler external piping. The bundles still, however[,] need to be constructed per ASME Code." (Plf.Exh. 26, at 4). Rodosevich also sought assurances from Niro that the tube bundles "will survive 20 years service in both the bicarb and mono-dryers." (Plf.Exh. 42, at 4).

In response, Lou Latimer of Niro wrote that construction of the tube bundles would be to ASME Code. Subsequent Revision Books to three dryers (in 1993, 1994, and 1995) state that the tube bundles would be designed and constructed in accordance with ASME Code. Latimer also wrote in an internal Niro memo about a telephone conversation with Rodosevich, in which Rodosevich "continually referred to the 20–year design life stated in their original specification. (Our contract with them makes no mention of this.)" (Plf.Exh.43).

According to Lou Latimer, Niro did not do the necessary design work to satisfy ASME Code, assuming that DEC would perform the required joint design geometry. However, according to a DEC engi-

**2.** In its reply, Niro "strenuously denie[s]" the inference that it compromised tube bundle quality upon discovery of the cost of code compliance. (Reply at 13). However, it must be noted that, as is not uncommon in the reply, Niro supplies no evidence in support of this construction. (See Reply at ¶¶ 55, 56).

**3.** In its reply, Niro notes that IMC's asserted fact is dependent upon the testimony of DEC engineer Michael Schmidt, and that Schmidt's testimony "is in direct conflict with that of DEC's salesman." (Reply at 13, ¶ 59). Of course, whenever there is conflicting testimony presented to the court in the context of a motion for summary judgment, the conflict must be resolved in favor of the nonmovant.

neer, DEC did not do any design work to ensure code compliance.

On May 13, 1993, Rodosevich wrote to Latimer that the specifications "clearly stated ... that the 'dryer design shall be based on a 20-year service life.'" (Plf.Exh.44). Latimer responded:

> Based on the most severe corrosion rate in the Sodium Carbonate dryer, this would allow for 120 eight hour washes during a 20-year period. (For instance, 20 during the first year and then 5 per year for the balance.) We feel that this will meet the intent of the specification.

(Plf.Exh.45). Latimer never objected to Rodosevich's comments by stating that the 20-year life service was not explicitly included in the April 2, 1993 contract.

On July 8, 1993, a DEC salesman sent a letter to Niro disclaiming any warranty that the tube bundles "will be merchantable and fit for the purpose intended" because DEC "did not design the equipment." (Plf.Exh.36). Niro accepted the disclaimer.

As noted earlier, construction under the contract was to be performed in a series of phases. Phase I, at a price of some $2.3 million, involved the installation of two dryers, Bicarb No. 1 (BFB–1) and Mono No. 1 (MFB–1). Phase II, at a price allocation of approximately $3.2 million, involved the installation of the Bicarb No. 2 (BFB–2) dryer. Other phases were to follow.

As of June 26, 1997, Niro continued to assure IMC that construction of the tube bundles would comply with ASME Code.

Niro's initial motion sought dismissal of plaintiffs consequential damages claims because of the exclusion in the contract. The Uniform Commercial Code explicitly permits such provisions, unless unconsciona-ble.[4] IMC makes no argument it its response that the contractual provision is in fact unconscionable. However, it does argue that Niro induced the contact by fraud and executed in bad faith.

The court finds that there is a triable question of fact as to Niro's liability for consequential damages. The evidence before the court demonstrates at least a colorable case of fraud in the inducement of the contract, or alternatively, bad faith it its execution. If proven at trial, either circumstance might justify an award of consequential damages notwithstanding the exculpatory clause in the April 2, 1993 contract. The court now cannot and does not view the claims of fraud or fraudulent inducement with an eye to whether they are persuasive; that is for the trier of fact. Rather, the court must conclude that, at the present time, they are at least colorable, and that accordingly Niro has not demonstrated its entitlement to summary judgment on the issue of consequential damages beyond a reasonable doubt.

## 2. Amendment

IMC's motion to amend will be permitted pursuant to Fed.R.Civ.Pr. 15(a), which provides that leave to amend is to be freely given when justice requires. Niro has failed to show that the proposed amendment is futile. A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1028 (10th Cir.1992). The court must reject the argument in Niro's response to the motion to amend that any amendment would be futile because the claims of fraud would be time-barred.

Whether the court were to apply California or Kansas law, the court cannot

---

**4.** UCC § 2–719(3) provides:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable.

find—at the present stage of the action—that the claims of fraud are untimely. Under Kansas law, the statute of limitations for fraud begins to run when the victim actually discovers the fraud, or, with reasonable diligence, should have ascertained the fraud. The term "reasonably ascertainable" carries with it an obligation to investigate available factual sources. *See Davidson v. Denning*, 259 Kan. 659, 678, 914 P.2d 936, (1996). Under California law, the statute of limitations for fraud commences to run only after the victim has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thereby putting him on inquiry. *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 437, 159 P.2d 958 (1945). "The relevant consideration is not whether plaintiff had mere "suspicions," but whether plaintiff had knowledge of facts sufficient to make a reasonable person suspect fraud." *Miller v. Bechtel Corp.*, 33 Cal.3d 868, 663 P.2d 177, 185, 191 Cal.Rptr. 619, 627 (Cal. 1983).

Without plunging into the details of the factual allegations, the court must conclude that IMC has provided some evidence that it had no actual knowledge of the purported fraud until the discovery stages of the present litigation. Further, read in the light most favorable to IMC, the court cannot conclude that the facts demonstrate that (1) IMC should have been suspicious of fraud, (2) an earlier potential investigation may have either produced evidence of the alleged fraud, or (3) IMC was unreasonably "lulled" into inaction by representations by Niro that it would work with

IMC to solve any problems with leaks in the tube bundles.

■ Similarly, the court cannot find the claims relating to breach of contract are time-barred.[5] Given the dates of the completion of the various phases of the project, the present action and proposed amendment would not be untimely under K.S.A. § 84–2–725(1). Similarly, as with the fraud claims, IMC has created at least a colorable argument that application of the statute of limitations would in any event be tolled by assurances from Niro that it would work to correct any problems with the equipment provided under the contract.[6] The court also finds that IMC's claim of breach of the duty of good faith and fair dealing will be allowed to proceed to trial.

Finally, the court must reject Niro's arguments of undue delay and prejudice. Given in particular the rescheduling of the trial created by the parties' announcement, and subsequent retraction, of their settlement of the present action, the court finds Niro has sufficient time to effectively respond to the claims of fraud and other matters now advanced by IMC. Niro's other claims of delay and prejudice are without merit.

### 3. Motion by Third Party Defendant DEC

DEC has moved for summary judgment on the claims advanced against it by Niro and IMC. Based upon the evidence identified by the parties, the court makes the following findings of fact.[7]

---

5. In reaching this conclusion, the court concludes that Kansas law governs the issue. *Miller v. Armstrong World Industries*, 949 F.2d 1088, 1089 n. 3 (10th Cir.1991). Although the contract here generally provides that Maryland law would govern relations between the parties, it states nothing as to what state's choice of law should govern as to the statute of limitations. Absent an express statement of intent, a standard contract provision on the choice of law will not be interpreted as covering a statute of limitations. *Federal Deposit Ins. Corp. v. Petersen*, 770 F.2d 141, 142–43 (10th Cir.1985).

6. As noted earlier with respect to Niro's motion for summary judgment, the court decides only that the amended complaint will be permitted. Whether the fraud claims are successful, and whether they are timely, present factual questions for the trier of fact.

7. The court notes frequent failures by defendant Niro, when disputing facts set forth by DEC, to support the denial with admissible evidence rather than argument as required by D.Kan.R. 56.1. Such facts are deemed admitted herein.

Under the April 2, 1993 contract between IMC and Niro, Niro was responsible for designing the fluid bed dryers. It is undisputed that, although that contract was entered into in 1993, the terms and conditions of the contract were not shared with DEC until 1998.

As noted earlier, Niro initially underestimated the cost of producing the tube bundles, budgeting approximately $559,000 for the bundles to be used in the first two dryers. DEC's initial bid for the tube bundles was $932,000. Another company bid $1.2 million for the same work.

Niro's management became concerned with the reduction in margin, and in February of 1993 directed its purchasing department to demand deep discounts from suppliers, to "expect best price and then discount that" in order to "make-up our lost margin ($3.8MM)." (Dep.Exh. 281, at 5). Niro also proposed a new design for tube bundles, reducing the number of welds. DEC submitted a new bid of $745,000 on March 5, 1993, based in part on the new design and in part to compete with another bid.

Niro's original bid documents had contained specifications stating "ASME CODE STAMP AND INSPECTION REQUIRED." Subsequently, however, Niro sent new plans for the tube bundles to DEC, which removed the ASME Code stamp requirement, and specifically stating that a code stamp and inspection were not required.

A subsequent bid by DEC in the amount of $660,00 was submitted by telephone on March 25, 1993. On March 30, 1993, Niro and DEC representatives met at DEC's facility in Madison, Wisconsin. Niro informed DEC that the tube bundles should be manufactured in compliance with ASME Code, but that they would not have to be Code stamped. There is a fact dispute between the parties as to whether Niro also explicitly told DEC at the meeting that it did not have to design the bundles. DEC subsequently sent a new bid in the amount of $640,800, which was accepted by Niro.

On April 26, 1993, Niro sent DEC a purchase order for the first set of tube bundles, which the parties have referred to as the Purchase Contract. The Purchase Contract incorporated plans for the tube bundles. These plans stated "CONSTRUCTION TO BE PER ASME CODE ... ASME CODE STAMP AND INSPECTION NOT REQUIRED." (Dep. Exh.182). The technical specifications also provided that the tube bundles be tested to ensure they did not leak when pressurized to the level of 1000 psig (pressure per square inch gauge). DEC in fact performed such pressure tests on the tube bundles. Niro has not made any claim that the bundles failed because of a failure to perform pressure tests on the bundles.

DEC never signed the Purchase Contract. However, on July 8, 1993, DEC employee Jim Brune sent a letter to Niro stating that DEC "would like to change" certain terms in the order. Among other items, Brune sought removal of a provision relating to patents on the tube bundles. He wrote that "[s]ince the equipment was designed by Niro, Inc., [DEC] cannot be held responsible for any patent infringement." The letter further stated that the phrase "will be merchantable and fit for the purpose intended" should be stricken since "again [DEC] did not design the equipment." (Dep.Exh.41).

It is uncontroverted that the Purchase Contract contains no language explicitly giving DEC any responsibility to design the tube bundles. There is a fact dispute, however, whether, even if DEC had no explicit design duties under the contact, it nonetheless in the course of performance did do some actual design work.

Niro accepted all the terms of Exhibit 41. Niro employee Ken Firedel wrote on Brune's letter "called ⅞, okay," and testified that he believed this indicated that he called DEC and agreed to the requests contained in the letter. He testified that it

was acceptable to Niro for the striking of the warranty language from the contract.

DEC produced the first two sets of tube bundles in the fall of 1993. During their construction, Lou Latimer of Niro visited DEC's facility. He approved the manner in which DEC was constructing the tube bundles, inspected a sample tube bundle, and agreed that the other bundles should be constructed in the same manner.[8]

The tube bundles were delivered to IMC's facility in Trona, California during late 1993 and early 1994. One of the fluid bed dryers went into operation in February 1994 and the other in May 1994.

DEC subsequently made another set of tube bundles for Niro using an amended design. The bundles were accepted by Niro, shipped to Trona, and incorporated into a fluid bed dryer that went into service in March, 1996.

After the dryers went into service, there were times when they failed due to problems with various components, including fans, the gill plate, and the "spreader" designed by Niro. None of these components was supplied by DEC, which provided only the tube bundles. There is no evidence of any problems with the tube bundles, other than occasional minor leaks which were expected by and repaired by IMC.

Beginning in the summer of 1996, IMC employees began to notice leaks in some of the welds in the tube bundles. IMC became increasingly concerned about the frequency and number of leaks in the bundles, and complained to Niro in January of 1997. Niro requested a failure analysis by Artech Testing, L.L.C.

Artech's report concluded that the welds had failed due to stress corrosion cracking. Stress corrosion cracking is, in general terms, a phenomenon that occurs to susceptible materials such as stainless steel when the materials are exposed to both tensile stresses and a high-temperature, corrosive environment. In this case, the stress corrosion cracking caused the welds in the tube bundles to crack and become pitted, resulting in small leaks that would allow the steam to escape.

The tube bundles, as part of their normal operations, would require occasional washing for cleaning and removal of product remaining from the drying process. IMC's Trona facility is near Death Valley and is an arid, desert environment with limited water. As a result, IMC used brackish "carbo" wash water—which contained a sodium chloride concentration from 1% to 6% (10,000 to 60,000 parts per million)—to clean the bundles. James Rodosevich of IMC acknowledged that the wash water was so corrosive it would take the paint off a car if it was used to wash one.

DEC used a duplex austenitic-ferritic alloy—ER–312—as the weld material in the tube bundles. The material is more resistant to stress corrosion cracking than "pure" stainless steel, which becomes susceptible to stress corrosion cracking when chloride levels exceed about 200 parts per million, at a temperature of 140–160 degrees Fahrenheit or more.

Early in the project, IMC was not aware of the risk stress corrosion cracking posed if stainless steel was used in the fabrication of the steam tube bundles. At first, both IMC and Niro believed stainless steel was an acceptable material. As a result, Niro's first request for quotation, sent to DEC on January 29, 1993, included a specification asking for a quote for fabrication using stainless steel. DEC's quote of April 2, 1993 provided price quotations for stainless steel tube bundles.

However, IMC's view changed when it became more familiar with the process,

---

**8.** Niro responds by stressing that Latimer is not a welding expert, and thus was not able to give such blanket approval. However, the evidence remains uncontroverted that Latim-er approved the process, and there is no evidence that DEC was aware of this blind spot in Latimer's authority to approve continued production in the use of the wire welds.

however, and received a report from OL-RAN, an outside consultant, about the danger of pitting in stainless steel washed in brackish water. The OLRAN report stated that IMC personnel were "concerned that excessive corrosion may occur in these systems during washout periods and/or during the systems['] normal operation." (Dep.Exh.39).

Rodosevich told Niro that he recommended against the use of stainless steel, and recommended the use of carbon steel. He also recommended that, due to the risk of corrosion, the walls of the tube bundles should be increased from .083 to .120 inch. The request was passed on to DEC, which issued a June 8, 1993 change order to reflect the increased wall thickness. It is uncontroverted that Niro did not inform DEC of the results of the OLRAN report, or otherwise inform DEC that the product was being used in a corrosive environment.[9]

It is undisputed that Niro's original technical specifications for the tube bundles had included specific site date and environmental conditions. None of these conditions indicated any type of corrosive environment. Niro never told DEC that the site data was inaccurate as to the presence of a corrosive agent.

It is undisputed that the plans and specifications which Niro provided did not include any weld symbols which would specify the size and type of welds to be used, nor did they specify whether the particular weld material to be used was to be rod or wire in nature. After the tube bundles began to fail, Latimer inspected IMC's plant and concluded that Niro's "drawings and specifications probably should have been more specific as to exactly what the weld preparation and weld type to be made at each joint." (Dep.Exh.278). He wrote, "For future fabrication, more specific weld design, testing and welder qualifications should be required." (Id.)

ER–312 is a duplex austenitic-ferritic alloy, which is substantially more resistant to stress corrosion cracking than pure stainless steel. There is a dispute between Niro and DEC about the nature of welds using ER–312 wire. According to DEC, it had used these types of welds for 20 years to good success. ER–312 wire welds are widely used in the industry. Niro concedes that such welds "may be less susceptible to stress corrosion cracking than pure stainless steel in its unaltered state." (Reply, at 14). Niro contends that there is no evidence that ER–312 wire welds are appropriate for joining two pieces of carbon steel. Niro does not come forward, however, with affirmative evidence that ER–312 wire welds are inappropriate.

It is uncontroverted that DEC believed the ER–312 wire welds were satisfactory for the IMC tube bundles, given the specifications in the Purchase Contract, and in view of the fact that DEC had been told stainless steel was an acceptable base material for the tube bundles.

In order to conform to ASME code, one of the steps a shop must take is to have its welding procedures approved. DEC's use of ER–312 was permitted by the ASME Code; DEC's weld procedure # 203 (used for the IMC work) had been approved by the ASME. The welders used on the IMC job were trained and certified in the use of this welding procedure. DEC's ASME-

9. Niro attempts to controvert this point, citing testimony of James Brune of DEC, and arguing that DEC personnel could infer from the requested increase in tube thickness that the request was due to a corrosive environment. In fact, in the cited portion of his deposition, Brune responds positively to a question indicating that, after receiving the requested change, "one reason" for an increase in tube thickness might be corrosion. (Def.Exh. A, at 492). Brune states that he could not remember precisely but that it "would be common sense that you wouldn't go thicker unless you had a reason to do it." (Id.) He does not indicate that he considered corrosion the most likely cause of the requested change, simply that it was one possible explanation. And nothing controverts the evidence otherwise demonstrating that Niro never attempted to formally communicate the risks of corrosion to DEC.

approved welding procedure specifically allowed DEC to use the ER–312 weld wire to weld carbon steel to carbon steel. Niro's own experts have acknowledged that DEC complied with all relevant ASME requirements in selecting the ER–312 weld wire, and that there were no deviations from the ASME Code which contributed to the stress corrosion cracking in the tube bundles.

After the tube bundles at the Trona plant began to fail, the three parties discussed DEC's provision of replacements. In December of 1997, the three parties met in Chicago. An IMC vice-president had written to Niro in November, 1997 that IMC had "reached the firm conclusion that DEC is not qualified to perform the required work [and] we are not willing to accept additional work performed by DEC." (Dep.Exh.77). However, this information was not conveyed to DEC.

Niro and DEC representatives met to discuss the replacements for the next month. At this time, there was no explicit statement by Niro that it would indemnify DEC for the costs of the replacements.

Because of the need for sufficient lead time, DEC told Niro on January 22, 1998 that it was placing an order for the pipe for the replacement bundles. DEC's representative Paul Thompson wrote to Niro by fax that "we are relying on your faxes ... as authority to order material.... If we do not hear otherwise, we will assume that Niro concurs with our ordering the material and will indemnify us for any costs due to changes in specification." (Dep.Exh.137). There was no immediate response to this message. It is uncontroverted that DEC ordered materials—incurring total costs in the amount of $631,-185.90—for the replacement tube bundles based in part on good faith reliance on Niro's actions.

Thompson later wrote on March 9, 1998 to Niro that DEC was proceeding to order materials as "authorized by Niro," stating that the fabrication of the tube bundles involved "considerable cost" and that if the materials were not ultimately used for the IMC project, Niro would indemnify DEC for those costs. (Def.Exh.KK).

Niro President Steven Kaplan responded on March 12, 1998 stating: "Regarding the issue of payment for the new tube bundles, it appears from your comments that we should be able to work out acceptable terms between DEC and Niro." (Def.Exh.JJ). Kaplan wrote that Niro had not agreed to indemnify DEC "for costs incurred in the fabrication of the new tube bundles." (Id.)

In June of 1998, Niro told DEC that it would not be supplying the new tube bundles. DEC immediately took actions to mitigate its damages by informing its supplier and tube bender to stop work and by seeking buyers for any pipe it could not return. However, buyers to date have offered to pay only a small fraction of the purchase price of the unreturnable pipe.

In response to DEC's motion, Niro presents an additional factual discussion on a number of points. Niro stresses that it left the duty of welding design planning to DEC as an experienced company to select the right welds, and that DEC did the design work on the welds. Further, according to Niro personnel, they did not know that ER–312 wire welds were being used in the work.

However, while there is considerable focus on details of the welds and the welding procedure, Niro's response fails to make any independent showing of negligence or contractual breaches by DEC. Instead, repeatedly in its response Niro, disparaging DEC's motion as "premature" and "fundamentally backwards," merely passes the plate down the aisle. According to Niro, the allegations of fault in connection with the tube bundles are made by IMC, not by Niro. Niro abdicates any burden of actually and directly proving fault by DEC.

Thus, Niro denies that the bundles were not compliant with code, stating that "on all matters material to the failure of the

tube bundles, Niro *did* comply with the ASME Code." (Reply, at 36) (emphasis by Niro). Niro writes: "DEC goes to great lengths in its motion papers to indicate that Niro 'does not contest the fact that DEC constructed the tube bundles according to the ASME Code.'.... That is correct...." (Id. at 37). And Niro writes that DEC

asks Niro to put forth facts demonstrating its own liability, so that DEC can show it should not be responsible for that liability. **Niro, however, cannot present such facts because it believes none exists.** All Niro can do is point to IMC's pleadings (which do not constitute admissible evidence to demonstrate a genuine issue of material fact for the purposes of motions for summary judgment) and argue hypothetically.

(Id. at 39) (emphasis added).

■ Niro has presented no authority for the proposition that, as a third-party plaintiff, it need not respond to the motion for summary judgment of the third-party defendant beyond simply invoking the plaintiff's pleadings. Nor has the court identified any such authority. Instead, this court has previously rejected the suggestion that a third-party plaintiff may evade summary judgment on such grounds. In *Power Application & Mfg. Co. v. Moscow Agri-Industries, Inc.,* No. 86–1656–PFK, 1992 WL 363684 (D.Kan. Nov.10, 1992) the court held that a third-party defendant's motion for summary judgment on the defendant/third-party plaintiff's claim of indemnity based on negligence "imposes a duty on the part of both the plaintiff ... and the defendant advancing the third party claim to come forward with whatever evidence of negligence they may have." The court reserved ruling but subsequent-

ly granted the motion based on the mutual failure of both plaintiff and defendant to provide independent evidence to support the claim of fault. With respect to the defendant's response, the court noted that the defendant's response to the motion "merely recited the allegations of negligence made by" the plaintiff. *Power Application & Mfg. Co. v. Moscow Agri-Industries, Inc.,* No. 86–1656–PFK, 1992 WL 403038 (D.Kan. Dec.22, 1992). Since the plaintiff's evidence was insufficient to demonstrate fault by the third-party defendant, the court granted the motion for summary judgment.

A third party defendant, as a "party against whom a claim, counterclaim, or cross claim," is entitled to seek relief against a factually-unfounded claim under Rule 56(b). See 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D, §§ 1455, 1460 (1990). *See Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 274 (2nd Cir.1968) (holding that summary judgment motion by third-party defendant was not "premature" since rules permit such a motion can be made "at any time after a pleading stating a claim is served upon him provided it clearly appears that no valid claim against him exists").[10]

Fed.R.Civ.Pr. 56 and D.Kan.R. 56.1 require a party opposing a summary judgment motion to respond to the motions with admissible evidence showing a triable question of material fact. Niro is not obliged to adopt, as its own, IMC's *allegations* of fault. But it is required *for purposes of opposing the motion for summary judgment* to identify *some evidence* of fault by DEC, even if it is evidence with

---

**10.** A third-party plaintiff seeking indemnity from another party but without yet having had the chance for full discovery may of course seek relief under Rule 56(f), which permits a delay in granting summary judgment while more evidence is obtained. *See McVan v. Bolco Athletic Co.,* 600 F.Supp. 375 (E.D.Pa.1984) (denying as unfounded and speculative Rule 56(f) motion by third party plaintiff opposing motion for summary judgment by third party defendant, and subsequently granting the summary judgment motion by third-party defendant). Niro has sought no such relief here, nor, in light of the extensive discovery in the matte, does the court consider such relief appropriate.

which it otherwise ultimately and vigorously disagrees.

Instead, as noted earlier, Niro for the most part merely passes the responsibility to IMC as having "the initial burden of proof" on DEC's legal responsibility. (Reply, at 30). But IMC has informed the court by letter that DEC "accurately stated the facts supporting its Motion for Summary Judgment." (Letter of counsel Floyd R. Finch, Jr., March 17, 2000).

DEC has the right to test the allegations against it by summary judgment. Resolution of the motion is neither "premature" nor "backwards."

Turning to the evidence presented to the court regarding DEC's responsibility, the court finds that the third-party defendant's motion should be granted as provided herein.

■ The facts establish that Niro is a sophisticated purchaser of industrial equipment. It set exacting specifications for the equipment it sought from DEC. At no time did it inform DEC of additional requirements for the tube bundles, such as their ability to withstand a highly corrosive environment.[11] The welding material selected by DEC is frequently used, and was permitted under the contract specifications. The welds complied with the applicable industry code. Further, prior to entering into the contract with Niro, DEC expressly disclaimed any warranty of fitness for particular purpose. Niro accepted the disclaimer. Under these circumstances, whether the court applies the law of Maryland (*In re Lone Star Ind. Concrete R.R. Cross Ties Litig.*, 776 F.Supp. 206, 225 (D.Md.1991)) or the law of California (*Sunbeam Constr. v. Fisci*, 2 Cal. App.3d 181, 82 Cal.Rptr.446 (1969)), DEC as a supplier complying with specifications set by Niro is entitled to summary judg-

ment. *Wisconsin Elec. Power v. Zallea Bros.*, 606 F.2d 697 (7th Cir.1979)

Further, summary judgment is warranted in light of the contractual exclusion of warranty by DEC. However they are denominated, Niro's claims for indemnification ultimately spring from the Purchase Contract between the parties. Paragraph 9 of the agreement provides that DEC agreed to indemnify Niro "any breach of Seller's warranties and guarantees [or] any other breach of the terms of this Purchase Order." (Dep.Exh. 121, at ¶9). However, as noted earlier, the warranties in the agreement were limited. Paragraph 7 of the agreement provides only that DEC warranted the materials would be free from defects in materials or workmanship, and would "conform to applicable specifications, drawings, samples, or other descriptions given." (Id. at ¶7). DEC expressly required excision of any warranty of fitness for a particular purpose, and this requirement was agreed to by Niro.

The explicitly bargained-for (and conceded) exclusion of a warranty of fitness forms a basic, and limiting, element of the duties between the parties. It cannot be evaded merely by labeling what is in essence a contractual claim as a claim for general "indemnification."

In its motion for summary judgment, DEC also argued that it was entitled to summary judgment on the grounds that it was entitled to the benefit—as a third party beneficiary—of a provision in the IMC–Niro contract which provides that the warranty generated under the contract "shall not cover ... any defects arising from corrosion." (Dep.Exh.165). Niro does not respond to DEC's argument in its response. The third-party defendant's motion is granted on this additional ground.

Finally, the court will also grant DEC's motion on the alternative ground that

11. Niro makes much of the fact that one DEC agent (Brune) once visited the IMC Trona plant. But there is not the slightest evidence that Brune observed the corrosive washes while he was at the plant. The uncontroverted evidence is that Niro never communicated to DEC the need for the tube bundles to withstand a highly corrosive environment.

Niro, as the party primarily responsible for any defects in the tube bundles, has failed to prove its entitlement to indemnification. The evidence discussed earlier clearly establishes that Niro had superior knowledge of the conditions under which the tube bundles would operate. This knowledge was not shared with DEC. Niro's otherwise detailed specifications on the project are silent on the type of welds to use. DEC used welding materials commonly used in the industry. Given the evidence now presented to the court, and further assuming that the plaintiff establishes at trial that the welds were inappropriate given the nature of the tube bundle environment, the court would be unable to conclude other than that the primary responsibility for the failure was that of Niro. Indemnity is therefore inappropriate. *See Hartford Accident & Indemnity v. Scarlett Harbor Associates,* 109 Md.App. 217, 674 A.2d 106, 135 (1996), aff'd, 346 Md. 122, 695 A.2d 153 (1997).

The court will deny DEC's motion to the extent that it seeks (1) dismissal of Niro's indemnity claims owing to a failure of expert proof as to damages, or (2) that it is entitled to summary judgment on its reliance claim. The court agrees that expert proof of damages will be necessary. However, DEC's argument was advanced prior to the latest revised scheduling order (Order, February 9, 2000, Dkt. No. 169), under which discovery is set to be completed by September 15, 2000. Given the absence of time restraints in light of the current trial setting of January 23, 2001, the court believes that DEC's argument does not provide an independent basis for granting summary judgment, as opposed to permitting a limited extension of the time for Niro to supplement its experts' reports.

DEC's reliance claim rests upon Thompson's letter of January 22, 1998. However, it is unclear from the facts before the court what, if anything, had the parties stated regarding indemnification for DEC's materials purchases prior to the letter. More-over, the letter itself merely speaks of indemnification for costs "due to changes in specification." Only in his subsequent letter, which received a prompt repudiation by Niro in March does Thompson directly state that DEC wanted indemnification for unused materials.

The court will grant DEC's motion dismissing IMC's third party beneficiary claim against DEC.[12]

The present matter has been extensively briefed. IMC's motion seeking permission to file a surreply brief is denied since the pleading is unnecessary herein. Such pleadings are disfavored, and there are no exceptional circumstances compelling the filing of such a pleading in this matter. Further, given the careful review given to the extensive arguments and evidence submitted by the parties, the court does not encourage the filing of motions for reconsideration. Accordingly, any such motion and accompanying memoranda may not exceed 10 double-spaced pages in length, including supporting arguments and authorities, regardless of the number of points raised. Any response shall also be limited to five pages. No replies may be filed. In addition, any remaining dispositive motions shall no revisit matter considered herein.

IT IS ACCORDINGLY ORDERED this 27th day of April, 2000 that the defendant's motion for partial summary judgment (Dkt. No. 110) is hereby denied; plaintiff's motion to file second amended complaint (Dkt No. 115) is granted; plaintiff's motion to file surreply (Dkt. No. 145) is denied; third-party defendant's motion for summary judgment (Dkt. No. 158) is granted in part and denied in part.

---

12. As indicated elsewhere, IMC does not con-     test DEC's motion.