Gerald L. MICHAUD and Second Chance Plastics, Inc., a Kansas Corporation, Plaintiffs,

v.

Peter DUNCAN and Malcolm Barns, Individually, and Omnipol Pty, Ltd., an Australian Corporation, and Emery Airfreight Corp., d/b/a Emery Worldwide, Defendants.

No. 01–1285–JTM.

United States District Court, D. Kansas.

Feb. 10, 2003.

Donald S. Andersen, Law Offices of Donald S. Andersen, Wichita, KS, James J. Long, Wichita, KS, Gerald L. Michaud, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Gerald L. Michaud.

Curtis M. Irby, Glaves, Irby & Rhoads, Wichita, KS, for Omnipol Pty Ltd., Malcolm Barnes, Peter Duncan.

James J. Long, Wichita, KS, Gerald L. Michaud, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Second Chance Plastics, Inc.

Eric E. Packel, John J. Yates, Husch & Eppenberger, Kansas City, MO, for Emery Airfreight Corp.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

Four motions are currently before the court in this action by plaintiffs Gerald Michaud and Second Chance Plastics against an Australian manufacturer of plastics recycling machinery, along with its principal officers, and against Emery Airfreight Corporation. The plaintiffs have moved for summary judgment against both the Australian defendants (Dkt. No. 29) and against Emery (Dkt. No. 65). Emery has moved for summary judgment as well (Dkt. No. 66). It has previously moved to defer any ruling on the motion against the Australian defendants. (Dkt. No. 40). With the full briefing completed on all dispositive motions, it is now appropriate for the court to resolve all outstanding motions; the motion to defer is accordingly denied as moot.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely

upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence· supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiff, Gerald L. Michaud, is a resident of the State of Kansas, and resides in Derby, Kansas. Michaud is a prominent and very successful plaintiff's lawyer in the Wichita, Kansas area. At the time of these events, his net worth was in excess of $30 million.[1]

Defendant OmniPol Pty, Ltd. is an Australian corporation doing business in the United States of America. Operating under its directors, defendants Peter Duncan and Malcolm Barns, OmniPol has been engaged in the design, construction, manufacture, and assembly of plastic injection molding machinery for the purpose of recycling plastic waste. Duncan is an attorney and, before becoming a director of OmniPol, was the Attorney General for South Australia. David Taeuber was an employee of OmniPol and was involved in arranging for the shipping of OmniPol equipment.

The defendant Emery Distribution Services, Inc., is a Delaware Corporation, and is a subsidiary of Emery Airfreight Corporation, also a Delaware Corporation, both of which do business as Emery Worldwide. At all relevant times herein, Emery Worldwide has been engaged in the business of the arranging for the transportation and shipment of goods, both domestic and foreign, and has its principal place of business in Redwood City, California.

One of Emery Worldwide's subsidiaries, Emery Ocean Freight, provides freight booking services for its customers. Emery Ocean Freight does not own any of the means of transportation for the freight it forwards for its customers. Rather, it makes arrangements through various drayage, ocean freight and rail companies to transport the freight from the shipper to the consignee of freight.

Rhino Walls, Inc. is a Kansas Corporation, organized by Michael McGill, his wife, Connie McGill, and Cory Nicks. The McGills became interested in plastic recycling machinery after meeting with Barns and Duncan through the Wichita Chamber of Commerce in the latter part of 1999. Sometime between March 14 and April 14, 2000, the McGills traveled to Adelaide, South Australia to visit the OmniPol production facilities. During this visit, the McGills observed the machinery work as represented by OmniPol and watched it

---

1. Plaintiff Second Chance Plastics is a Kansas corporation Michaud organized after he had entered into the Equipment Technology License Agreement with OmniPol Pty, Ltd. Second Chance Plastics advances certain claims against the Australian defendants, but none against Emery.

produce goods from scrap plastic materials. The McGills also observed the operation of a plastic injection recycling machine.

On April 14, 2000, Mike McGill, as President of Rhino Walls, entered into an Equipment Sale and Technology Licence Agreement with OmniPol, by which Rhino Walls agreed to buy two plastic recycling machines. Under the Agreement, the contract price for two machines was to be $1.96 million[2] supported by an irrevocable letter of credit. The Agreement set forth a payment schedule: 1/3 at the commencement date; 1/3 on notification by OmniPol to the customer that the equipment is ready for transportation to the customer; and 1/3 upon commissioning of the equipment on the customer's site. (Plf.Exh. 2, Sched.4).

The Agreement also provided "Special Conditions" under which OmniPol would discount the purchase price from $1.96 million to $1.2 million if Rhino Walls either gave an irrevocable international letter of credit in the amount of $600,000 to OmniPol, or if it paid that amount by telegraphic transfer to an OmniPol bank account, by 5:00 p.m. Australian Time[3] on April 20, 2000.

The Agreement provided that if the Special Conditions giving rise to the price reduction applied, then the $1.2 million would be payable as follows:

4.2.1. a deposit as provided for in 4.1 of U.S. $600,000: should the special condition have become operational by way of provision of an irrevocable international letter of credit then interest at the rate of 10% per annum shall be paid by the customer to OmniPol until payment of U.S. $600,000 is received.

4.2.2. On notification to the customer by OmniPol that "the equipment is ready for transportation to the customer—US $300,000 plus any interest due and an irrevocable international letter of credit for the amount of $300,000.

4.2.3. On commissioning of the equipment on the customer's site—US $300,000 plus any interest due.

(Id.) Schedule 5 to the Agreement contains customer site requirements for foundation, size and power supply. Schedule 6 to the Agreement provides that the equipment would be "manufactured to specification and ready for transportation one hundred and twenty days from: a) commencement date OR b) should clause 4 of schedule 4 special condition apply, one hundred and twenty days from the twentieth day of April 2000." (Id.)

After he came back from Australia, McGill spoke with Michaud. He knew Michaud through their mutual interest in contract bridge over a number of years. McGill asked Michaud to help him buy the machines. Michaud declined to directly invest in the machines, but indicated that he would be willing to help McGill and agreed to guarantee a letter of credit to Rhino Walls.

Michaud took McGill to meet Michaud's banker, Jack Roberts at Intrust Bank, for the purpose of drawing up the letter of credit and guaranty. On April 25, 2000, an irrevocable letter of credit in the amount of $600,000 was prepared by Intrust Bank, Wichita, Kansas for the benefit of OmniPol Pty, Ltd. This letter of credit had an expi-

---

**2.** Except where explicitly noted, all monetary figures herein are expressed in terms of United States dollars.

**3.** Because of the International Date Line, Australia is one day ahead of the United States. Depending upon daylight savings time, there is a 16.5 hour difference in time between Adelaide and Wichita.

ration date of October 21, 2000. At the time that this letter of credit was issued, Michaud signed a commercial guaranty on behalf of Rhino Walls, Inc., as its guarantor. The documents needed to draw on the irrevocable bank letter of credit were: (a) "A statement purportedly signed by OmniPol Pty, Ltd., certifying that Rhino Walls, Inc., is in default under the Equipment Sales and Technology License Agreement dated April 14, 2000 by and between Rhino Walls, Inc., and OmniPol Pty, Ltd. and the draft presented represents amounts now due and owing," and (b) "The original letter of credit." (Def.Exh. F). This letter of credit satisfied § 4.2.1 of the Agreement.

At the time he signed the guaranty for the letter of credit, Michaud had not had any prior business transactions or dealings with McGill, and had not previously loaned him any money. He has testified that he did not pay too much attention to McGill's business plan because he assumed McGill did not have the money to buy the machines and could not get the money from the banks. He did not believe that McGill would ever have the money to pay off the $600,000 letter of credit. It was never Michaud's intent to require McGill to repay him if the guaranty was called upon to repay the bank for the letter of credit. In fact, Michaud believed that McGill was of no financial substance.

Prior to making the commitment to guarantee the letter of credit for McGill, Michaud did not do any investigation of OmniPol. He relied on McGill to have done that. Michaud did not review the Equipment Sale and Technology License Agreement between Rhino Walls and OmniPol before guaranteeing the letter of credit.

The same day the letter of credit was signed, Rhino Walls and OmniPol executed an Amendment and Supplement to Equipment Sale and Technology License Agreement. Under this Amendment, the payment schedule on the purchase of the two plastic recycling machines was amended to reflect that the initial payment would be made "[u]pon notification by OmniPol to Customer that the Equipment is ready for shipping, which shall include presentation to Customer of the shipping bill of lading showing all of the Equipment ready and prepared for shipping, and an original counterpart of the bill of lading being a prerequisite for a draw on the letter of credit. . . ." (Plf. Exh. 6, at 2, ¶ 4.b). The resulting Amended Agreement modified the payment terms under Schedule 4 by extending the date the initial $600,000 irrevocable letter of credit was due by five days—from April 20 to April 25, 2000—and by providing that the second and third installments of the $1.2 million contract price (of $300,000 each) would be due, respectively, upon notification that the Equipment is ready for shipping by presenting a "shipping bill of lading," and upon installation of the equipment and a joint certification that it was fully functional. (Def. Exhibits E and H).

The initial $600,000 irrevocable letter of credit was tendered to OmniPol on April 25, 2000 as required by Section 4.1 of the Amended Agreement and by (unamended) section 4.2.1 of the Agreement. The $600,000 irrevocable letter of credit guaranteed by Michaud made no mention of the separate contract requirement, in section 4.2.2 of the Amended Agreement, of ". . . presentation to Customer of the shipping bill of lading showing all of the Equipment ready and prepared for shipping, and an original counterpart of the bill of lading being a prerequisite for a draw on the letter of credit,—US $300,000 plus any interest due, under an irrevocable international letter of credit." (Exhibit F).

On or about May 23, 2000, with the consent of Rhino Walls, OmniPol assigned

its rights to payment under the April 25, 2000 $600,000 irrevocable letter of credit to its bank, Bank One of Adelaide, Australia, to secure a line of credit ("carry on finance"). Under the letter of credit as amended, the beneficiary was changed from OmniPol Pty, Ltd., to Bank One, NA, and the documents required for negotiation in the original letter of credit were deleted and replaced with "A certificate signed by an authorized signer of the beneficiary stating the following: 'This standby letter of credit is for the purpose of financial accommodation provided to Omni-Pol Pty, Ltd. (ACNO77 259 342) of 102 Tynte Street, North Adelaide, 5006, South Australia. The draft presented herewith represents an amount now due and owing because OmniPol Pty, Ltd., has defaulted on its financial obligations to Bank One, NA.' " (Def.Exh. I).

Rhino Walls and McGill were unable at the end of July, 2000 to secure financing (beyond the letter of credit which had been guaranteed by Michaud) for the other half of the $1.2 million purchase price of the machines. On July 25, 2000, McGill was told that Rhino Walls's request for a State of Kansas grant in the amount of $1 million had not been approved. On July 28, 2000, McGill wrote to Duncan, telling him of the decision and stating: "As you already know, we have been turned down for bank loans, and we were depending heavily on grant funding to go ahead with the equipment purchase and plastics manufacturing. This latest turn of events has created a very negative situation with regard to our plans. We thought we should advise you of the situation as soon as possible, and will now need to discuss alternative solutions." (Def. Exh. J, at 115–16).

Duncan and John Tidd of OmniPol visited with the McGills in Wichita during the last week of August 2000 to discuss how to proceed in light of Rhino Walls's inability

to secure financing for the remainder of the purchase price of the machines and for the cost of setting up the recycling facility as originally planned. At the conclusion of this meeting, there was definitely a question as to whether Rhino Walls would be able to meet its obligations to OmniPol. The decision was made for Rhino Walls to sell the two machines for which it had contracted to another U.S. buyer.

It had been agreed that OmniPol was to ship the machines to Rhino Walls on or before September 25, 2000.

Sometime in July, 2000 David Taeuber of OmniPol initially contacted John Forster of Emery about arranging shipment of plastic recycling machines to various locations in the United States, Canada and Indonesia. Forster was employed by Emery Worldwide, and had the authority to issue bills of lading on behalf of Emery Worldwide. Forster knew Taeuber because of shipments Emery had handled for Taeuber when he worked at Tytronics, an electrical components manufacturer. Taeuber and Forster had a business relationship that preceded the July contact by approximately 18 months.

Taeuber later contacted Emery Ocean Services in Adelaide for a quote for shipping plastic recycling machinery to Kansas. On September 21, 2000, Emery made arrangements for a cartage company to deliver two 40–foot containers to OmniPol for loading and anticipated shipment with APL Shipping Line on the vessel PONL BRISBANE, V33. The two shipping containers were to be loaded by OmniPol and not by Emery employees.

On September 25, 2000, Emery received confirmation of its booking for OmniPol of two 40–foot containers with P & O Nedlloyd on the vessel Brisbane, Voyage 33n, departing October 6, 2000.

On September 26, 2000 (Australia), Taeuber called Forster and told him that the two containers had been loaded, and requested Emery to issue a shipped on board bill of lading because the consignee had requested a copy of the shipping documents. Forster told Taeuber that a shipped on board bill of lading could not be issued until the containers were on board the vessel, but if the goods were packed, he could issue a received for shipment bill of lading. Taeuber requested that he do so.

Forster instructed Anthony Saba, the lead ocean freight clerk for the Emery Ocean Freight office in Adelaide, South Australia, to prepare the received for shipment bill of lading. Saba called OmniPol and received confirmation from Taeuber that the containers were packed and had been sealed by OmniPol. Saba then faxed to Taeuber an original bill of lading to OmniPol Pty, Ltd., representing that Emery Worldwide had "Received for Shipment 2x40' CONTAINERS, S.T.C. ['Said to Contain'] 2 PLASTIC RECYCLING MACHINES." (Plf.Exh. 7).

The received for shipment bill of lading identified the consignee as "F.H. CAYSING, 920 NORTH TYLER ROAD, WITCHITA [sic] KANSAS USA", and provided "NOT NEGOTIABLE UNLESS CONSIGNED TO ORDER." (Def. Exh. M, at 1). The bill of lading also provides:

> The Carrier issues this as a Combined Transport Ocean Bill of Lading and may issue 'on board bills' of lading at the time cargo is loaded into ocean containers ('Container(s)'). For the purpose of this agreement, Container(s) shall be considered an extension of a vessel and cargo deemed to be 'on board' when loaded into Container(s), whether or not the container(s) is actually loaded on board the named vessel. If a Container(s) is loaded on board a substitute vessel this shall not extend the Carrier's liability in any way.

(Id. at ¶ 6(c)). The Bill of Lading is dated at Adelaide, October 6, 2000, which was the date the Nedlloyd Brisbane was to sail.

At the time the received for shipment bill of lading was issued, both Forster and Saba believed that the goods were packed and ready for shipment based upon representations made to them by Taeuber.

On September 25, 2000(US), counsel for OmniPol, Curtis Irby, hand-delivered to Mike McGill, a letter of "Notice of OmniPol ... Equipment Ready for Shipment." This letter advised McGill that pursuant to the Equipment Sale and Technology License Agreement two (2) plastic recycling machines were "ready for transportation (shipping) to the customer." (Plf.Exh. 8). Thus, payment was required in the amount of $900,000, plus interest in the amount of $25,500. (Def.Exh. N).

On or about September 26, 2000 (Australia), in response to McGill's request for a "shipping bill," Duncan faxed a copy of the original bill of lading issued by Emery to McGill. Pursuant to the terms and conditions of the contract, the September 26, 2000 bill of lading issued by Emery Worldwide provided that the "contract evidenced or contained in this Bill of Lading shall be governed by the law of the United States of America." (Plf Exh. 7). It also provided that, "[n]otwithstanding the provisions of Section 1(c) of COGSA, COGSA shall govern throughout the entire time the goods are in the custody of Carrier until delivered." (Id. at 1, ¶ 2(a)).

The first time Emery became aware that the goods had not been completely ready for shipment on September 26, 2000, was when Saba called Taeuber on October 5, 2000 to have the containers picked up for delivery to the dock and loading on the Brisbane. At that time Taeuber advised

that there were other items to be placed in the container.

The shipment of the two containers for OmniPol would have resulted in a profit to Emery of (Australian) $360.96.

On or about September 29, 2000(US), Irby spoke with Michaud to confirm that Michaud had guaranteed Rhino Walls's letter of credit for the purchase of the machines. During this conversation, Michaud told Irby that he did not want to put up any more money, that he expected to be repaid the $600,000 when the machines were sold to another purchaser, and that he thought the recycling of plastic was a good idea.

On October 1, 2000, Michaud spoke with Irby, during which conversation Michaud agreed that the $600,000 letter of credit could and would be called, that the machines would not be shipped unless McGill (Rhino Walls) made the second installment payment of $300,000 plus accrued interest on or before October 4, 2000(US), and Michaud discussed possibly purchasing the machines for "an additional $600,000" beyond the $600,000 letter of credit that was likely to be called. (Michaud Dep. at 82, 85).

On October 4, 2000(US), Irby delivered a notice of breach to Rhino Walls advising that the letter of credit was being called by OmniPol's bank because, as of October 4, 2000, Rhino Walls had failed to make payment of the $325,500 due on that date, and that it was in material breach of the Equipment Sale and Technology License Agreement. As of that time, Rhino Walls had not tendered payment to OmniPol of the $325,500 then due.

The same day, Calvin Wiebe, Counsel for Rhino Walls, sent a letter to OmniPol's counsel stating that "There is no basis for a call on the letter of credit. Any call on the letter of credit would be actionable." (Def.Exh. P).

After the $600,000 irrevocable letter of credit was negotiated by OmniPol's bank, Rhino Walls and Michaud executed a promissory note in the amount of $601,500.

On or about October 5, 2000(US), McGill contacted Janet Sweeney seeking to trace a shipment from Australia to Wichita. In response, Sweeney e-mailed Forster concerning the status of the containers.

On October 6, 2000 (Australia), Forster responded, stating:

> Hi Janet thanks for the email this is indeed a shipment originating from Adelaide but not yet even picked from the shipper.
>
> Shipment is still being packed and as yet has not sailed from Adelaide. We have issued received for shipment bills of lading which we will convert to full originals once the vessel sailed. At this stage I am anticipating ETD from Adelaide on the 13 Oct 2000 and arrival into Wichita on the 15 Nov 2000. Cargo is moving via APL over Singapore so will advise details in due course.

(Plf.Exh. 12).

On October 6, 2000(US), the irrevocable letter of credit was called by OmniPol's bank under the terms of the Agreements entered into between Rhino Walls and OmniPol.

The following day, Sweeney responded to Forster's e-mail. In her e-mail, Sweeney stated that a broker in Wichita had faxed her a copy of an original bill of lading issued from the Adelaide, Australia office, and noted per Forster's statement, "shipment has not been pick [sic] up by at shipper location." (Plf.Exh. 14).

On October 8, 2000 (Australia), Forster responded to Sweeney. In his e-mail, Forster wrote "Janet the original bill of lading is a received for shipment bill of lading as requested by the shipper. I will speak

with the shipper and have them speak with the consignee." (Plf.Exh. 15).

McGill again e-mailed Sweeney on October 10(US) to discuss the bill of lading. He asked why Emery would issue an "Original" house bill of lading without taking possession of the freight. He also asked whether the bill of lading was an original bill of lading, and whether the Emery stamp on the bill of lading was "an official stamp." (Plf Exh. 16).

Sweeney e-mailed Forster, and asked "when Emery will actually pick up these two containers [which contained] over a million dollar commodity." (Id.)

On October 11, 2000(US), Sweeney informed Christine Callahan, Director of Ocean Services for Emery Worldwide, that the Adelaide, Australia office had "issued an original B/L prior to the freight being picked up." (Plf.Exh. 17). Christine Callahan responded the same day (carbon copying her response to Forster):

> John: please clarify for me. Was EWW in receipt of the cargo prior to issuing the bill of lading? It is not accepted industry practice, and certainly not EWW practice to issue a bill of lading for cargo not yet in our receipt. If cargo was in our hands but not packed into the container yet it is a different issue. Also, we have forwarders cargo receipts that have been printed and distributed to all international locations. I suggest that if the shipper requires a document to indicate passage of freight to a forwarder this is the document to use. Christine.

(Plf.Exh. 18).

In an effort to determine how to proceed upon Rhino Walls's default on the Agreement, Duncan and Barns flew to Wichita from Australia on October 12, 2000(US) and met the next day at Michaud's ranch,

where they were staying as his guests. This meeting was attended by Duncan, Barns, Michaud, Michael and Connie McGill, and by the attorneys Wiebe and Irby. As noted earlier, McGill had been in contact before the meeting with Emery personnel in Kansas City and had obtained copies of e-mails between Forster and Emery Kansas City that caused him to conclude that despite the bill of lading indicating that the machines had been "received for shipment" on September 26, 2000, "they have not even packed the boat." He expressed his concerns in a letter that he sent to his attorney, Calvin Wiebe on October 9, 2000.[4] On October 12, 2000, McGill had a conversation with Eric Denny, an Emery employee in Houston, concerning the Emery bill of lading being issued "without the containers being taken to the dock, sealed and placed on the ship." (Def. Exh. T, McGill Dep.at 186–89). Michaud has acknowledged that McGill "kept telling me" that a breach of the contract had occurred, and that OmniPol was not entitled to call the letter of credit; and acknowledges that "there was some discussion of bills of lading at this time." (Michaud Dep. at 87).

It is uncontroverted that, during the October 13 meeting, McGill and Wiebe raised the fact that the "received for shipment" bill of lading was issued without the goods being received. Michaud dismissed McGill's concerns as "nitpicking." (Michaud Dep. at 87, 106–107). McGill was offered the opportunity during the meeting by Barns and Duncan to go forward with the contract for the purchase of the machines if he or Rhino Walls "was willing or able to put up its $325,500," but McGill declined to do so after consultation with his counsel, Mr. Wiebe. (Michaud Dep., at 103–105).

---

**4.** McGill has testified he is certain that he shared these e-mails with Michaud. Michaud denies seeing the e-mails prior to the meeting or his purchase of the machines.

The meeting was concluded with the decision that McGill, Duncan, and Barns would pursue sale of the two machines ordered by Rhino Walls to Innovative Waste Technologies, Inc., of Texas for $1,960,000. It was agreed that the first third of the sale price would pay off the $600,000 note due on the letter of credit, and $196,000 would go to McGill as commission for the sale of the machines. However, the sale to Innovative Waste Technologies was never completed.

Barns stayed at Michaud's ranch as his guest until November 21, 2000, when he returned to Australia. During that time, Michaud agreed to loan Barns $1,000,000 to help him forestall foreclosure on his ranch in Australia. During the time that Barns stayed at his ranch, Michaud became enthusiastic about the OmniPol machine to the point that he "thought the opportunity was great that if everything fell into place, that it could become one of the biggest industries in the country." There were discussions about Michaud buying the machines. (Id. at 121–22).

On October 14, 2000(US), having not received a response to her e-mail, Callahan again e-mailed Forster. In her e-mail, Callahan again requested information and stated:

John: I have not received a response to this question, but the plot thickens. Apparently cargo was on an l/c and consignee processed the bill of lading and the shipper has been paid for the goods that have not been shipped. Consignee is out the money and the product. No question they will sue us. We must have an understanding as to how this transpired. Why did we issue an original on board bill of lading for cargo not in our possession? We are on the hook for the value of the cargo under these circumstances. A loss in excess of $600,000 ... the value of the L/C. Christine

(Plf Exh. 19).

On October 13 (Australia), Forster responded to Callahan. He stated:

Christine we have not issued an on board bill of lading. We have issued a received for shipment bill of lading. I am awaiting instructions for the shipper as to final paperwork and when speaking with the consignee this week he advised that they are no longer the consignee. If they have paid the money then I will speak with the shipper and find out what is happening with this shipment. The bills were cut as a straight bill of lading with no mention of a letter of credit ... they are not marker to order so the L/C must be on the finance side of things and not on the shipping. I will check again with the shipper on Monday and advise what is their interpretation and advise all parties concerned.

(Plf.Exh. 20).

On October 17(US), Callahan e-mailed Forster:

Did we issue a received for shipment bill of lading when we had not received the cargo? The notation on the b/l says received for shipment 26–SEPT–2000 and the bottom of the b/l is dated October 6th so it appears to be an on board bill regardless of what the body of the bill of lading states. It is feasible to have received the shipment on 26th of September and issue an on board 6th of October. This is critical to the entire issue at hand.

I have also never seen originals created for shipment receipt.

We need to take a look at procedures outside of this specific shipment.

Christine

(Plf.Exh. 21).

Forster responded on October 17 (Australia):

Christine, we did issue a received for shipment bill of lading without having taken physical control of the cargo. This was done in the interest of saving additional costs of wharf or depot storage until final payment was received from the consignee. We are now organising [sic] to collect the cargo from the shipper tomorrow and hold until this issue is resolved.

TThe [sic] shipper has advised that the letter of credit was issued some months ago and the first payment for this machine was made some 3–4 months ago prior to us being involved. From my understanding the bill of lading was not used to draw funds against this order but a letter of demand with a copy of this document provided. The consignee was then unable to raise the additional installments and from the shipper point of view has defaulted on the contract. How this afeects [sic] us I am not sure. I also believe that this guy borrowed the money from a solicitor in Houston and has been told to back out of the deal and it is currently being renegotiated with the original financer. Again don't know how this affects us.

I ca not [sic] explain the difference in dates on the bill. It was issued from Netcom so can't answer this anomaly. (Plf.Exh. 22).

On October 18(US), Callahan again e-mailed Forster. She stated that "it is corporate policy not to issue received for shipment bills of lading when we are not in receipt of the cargo" and that "at this point in time the best thing to do is take possession of the cargo. Please confirm when you have received same." (Plf.Exh. 23).

On October 23 (Australia), Forster e-mailed Callahan. He wrote that the "cargo is now confirmed in our possession being held at our transport company until we have advice to ship." (Id.).

On October 25, Anthony Saba requested that the transport company arrange for the collection of the 2x40′ GP's from Omni-Pol. Saba faxed to Wayne–Symons & Clark Transport a request to arrange for the collection of the 2x40′ GP's at Omni-Pol.

At no time prior to the issuance of the original bill of lading on September 26, 2000, did either John Forster or Anthony Saba inspect the containers delivered to OmniPol to determine whether they were packed or sealed for shipment.

On November 20, 2000(US) Michaud met with Irby to discuss Michaud's purchase of the machines manufactured by OmniPol for Rhino Walls.

On November 24, 2000, McGill and Michaud discussed Michaud's purchase of the two machines. During that discussion, Michaud agreed to release McGill from the promissory note for the $600,000 bank letter of credit, and to pay the note plus interest. McGill also offered to assign Rhino Walls to Michaud and to provide him with

copies of legal work done by our attorney Cal Wiebe in determining that Emery Worldwide irresponsibly issued the bill of lading, and that OmniPol billed against this bill of lading. We feel that the use of the bill of lading may have been a fraudulent act on the part of Emery or OmniPol. Possibly Emery would pay damages for the actions of their personnel. This could include paying for the 2 containers of freight to the US. The way the contract was canceled could, also, be a vehicle to force the Australians to pay back the $600,000.

(Michaud Dep. at 145). Michaud did not follow up with McGill, Wiebe or Emery about McGill's suggestion that the bill of lading had been part of a fraud on Rhino Walls.

On November 29, 2000 Michaud entered into an Equipment Sale and Technology License Agreement with OmniPol to purchase the Rhino Walls machines for $800,000 under the following payment schedule: (a) "Upon execution of this agreement OmniPol Pty, Ltd., will acknowledge the payment of a further U.S. $600,000 by the customer, such amount having been paid to OmniPol and forfeited pursuant to a contract between OmniPol Pty, Ltd., and Rhino Walls, Inc," and (b) "Upon installation and operational commissioning of the equipment on the customer's site: US $200,000." (Def.Exh. T).

The $200,000 payment upon installation applied by Michaud, with OmniPol's consent, to Michaud's expenses incurred trying to correct problems encountered in the installation and operation of the plastic recycling machines.

On November 29, 2000 Michaud, on behalf of GLM, Inc., a corporation which he had established some time before, entered into a separate Agency Agreement to be the exclusive agent for OmniPol in Canada, the United States of America and Mexico for the OmniPol Plastic Recycling Machines. Michaud paid $400,000 for the Agency Agreement.

The Equipment Sale Agreement and Agency Agreement were negotiated by Roger Sherwood, who represented Michaud and GLM, Inc., and Curtis Irby, who represented OmniPol.

Michaud and his wife visited OmniPol's two facilities in Australia in early January 2001 where they had the opportunity to observe the machines in operation producing products from recycled plastics. This visit confirmed to Michaud that the Omni-Pol technology was a technology that could work.

On November 26, 2000 (Australia), Anthony Saba issued a shipped on board bill of lading. The Shipper was OmniPol Pty, Ltd., and the consignee was OmniPol Pty Ltd., c/o Garvey Public Warehouse. The freight was described as "2x40' containers S.T.C. 2 plastic recycling machines, shipped on board 26 Nov 2000." (Def Exh. Z).

Michaud does not contend that there was anything inappropriate about the handling of the shipments of November 26, 2000 and December 15, 2000 or the "on board" bills of lading issued by Emery in connection with those shipments.

Michaud was unable to assemble, operate or utilize the two plastic recycling machines that had been purchased from OmniPol and has asserted claims in this litigation against OmniPol, Duncan and Barns because of his inability to get these machines to function properly.

Michaud chose not to pursue Rhino Walls or McGill for the $600,000 McGill owed him as a result of the letter of credit he had guaranteed. He paid off McGill's indebtedness to Intrust Bank ($600,000 plus interest), and released McGill's obligation to repay him.

On March 19, 2002(US), Michaud, on behalf of Second Chance Plastics, Inc., sold the OmniPol machinery that Michaud had purchased on November 29, 2000, to Fibr-Plast, Inc., of Tulsa, Oklahoma, for $600,000, paid in Fibr-Plast stock.

Michaud did not see the received for shipment bill of lading dated October 6, 2000 until after he had signed the contract to purchase the two OmniPol plastic recycling machines on November 29, 2000.

Michaud has testified that Emery never made a false or inaccurate representation to him with regard to the bill of lading

dated October 6, 2000. He has also testified that Emery never made a false or inaccurate representation to Michaud of any kind regarding the OmniPol machinery or its arrangements to transport them. The only alleged false statement attributed to Emery by Michaud was the failure of one of its in-house attorneys to "get back to" Michaud as he said he would, shortly before Michaud commenced this litigation against Emery.

Notwithstanding plaintiff's frequent citation to federal statutory provisions or invocations of contract law, the court finds that Kansas state law governs the only claims which are advanced against Emery herein. Those arguments have been expressed in various terms in the Pretrial Order, but reflect at most claims sounding in state tort law for misrepresentation, fraud, or conspiracy to defraud.

■ The court finds that it has no option but to deny summary judgment in favor of plaintiffs on the claims against Emery, for the same reason that the motion by Emery must be granted: that is, Michaud's claims, whether couched as misrepresentation, fraud, or conspiracy to defraud, all require proof of justifiable reliance. *See Rodriguez v. ECRI Shared Services,* 984 F.Supp. 1363, 1364 (D.Kan. 1997). And here, the uncontroverted evidence establishes that Michaud, in executing the unconditional guaranty of the irrevocable letter of credit, was not relying upon the actions of Emery many months afterwards.

That letter of credit and personal guaranty required by the bank were prepared by Michaud's Bank, Intrust Bank, at Michaud's request. He executed the guaranty April 21, 2000. At that time, the initial Agreement between OmniPol and Rhino Walls was utterly silent as to any bill of lading as a precondition for payment. The guaranty also makes no reference to the issuance of a bill of lading as a precondition for liability.

In the present case, the Amended Agreement, with its language indicating that a bill of lading would be necessary before Rhino would be obliged to pay, was not executed until after Michaud had executed the guaranty of the irrevocable letter of credit. The court holds under the facts of this case as a matter of law that the plaintiff could not, in guaranteeing the irrevocable letter of credit, have been justifiably relying on factual events and contract modifications which were executed only after the guaranty. The uncontroverted evidence, including his own deposition testimony, negates the argument advanced by plaintiff that in signing the guaranty he was somehow relying on events or discussions which could only have occurred long after the execution of the guaranty.

Further, not only did plaintiff's action in guaranteeing the letter of credit well predate the supposedly misleading bill of lading issued by Emery, his liability under the guaranty in any event was not created or caused by that bill of lading. That is because the original Agreement between OmniPol and Rhino Wall unambiguously provided that the $600,000 letter of credit, which was the subject of the guaranty, was provided to secure the original down payment due under the contract. The Special Conditions section of the original Agreement provided that the first installment was due on April 20, 2000, and that subsequent payments would be due when the machines were "ready for transportation." (Agreement § 4.1–2). The secondary payment due at that time would take the form of $300,000 in cash and a letter of credit in the amount of $300,000.

The Amended Agreement altered this arrangement by providing that the initial installment would be due April 25 rather

than April 20. The Amended Agreement also provided that the second installment would be triggered by notification that OmniPol was ready to ship the equipment, including provision of a bill of lading. In both Agreements, the provision of a $600,000 letter of credit only arises with respect to the initial installment payment under the contract. The only understanding of the Amended Agreement which gives a fair and reasonable interpretation of all of its provisions is that which views the provision of a bill of lading as relating only a hypothetical second letter of credit, in the amount of $300,000. It has no bearing on plaintiff's liability on his guaranty of the original $600,000 letter of credit.

■ Plaintiff's argument that the letter of credit could be called only after Emery released the bill of lading is without merit. Here, the letter of credit which plaintiff guaranteed was explicitly irrevocable in nature. It also provided that payment would be due upon OmniPol's statement that Rhino Walls was in default and that the draft amount was then owing. The letter of credit thus sets a specific, and not particularly high, threshold for OmniPol to obtain payment. Certainly there is no provision that payment in any way depends upon submission of a bill of lading.

Further, and in any case, the letter of credit was itself amended by the Agreement of Rhino Walls and OmniPol on May 23, 2000. Under that Agreement, the beneficiary of the letter of credit was changed from OmniPol to OmniPol's bank, Bank One, NA. The earlier, limited conditions for calling the letter of credit were even further reduced. The bank was empowered to call the letter of credit on the grounds that OmniPol had defaulted to the bank. Thus, the letter could be called (and indeed actually was called) wholly independently of any bill of lading.

■ The court rejects Michaud's argument that, after executing a guaranty of an irrevocable letter of credit, he could somehow have altered or reduced his liability based upon the subsequent actions of third parties. First, the uncontroverted evidence establishes that Michaud would have been responsible under the guaranty in any event. He knew the primary officer of Rhino Walls could not repay the underlying obligation if it was called. Nonetheless, he guaranteed all of Rhino Walls's obligations to Intrust. The court agrees with defendant: if Rhino Walls subsequently entered into Agreements which led to liability under the guaranty, that may justify an action against Rhino Walls; it does not justify a tort claim against Emery.

Moreover, the suggestion that Michaud could have altered or diminished his liability is unsupportable in light of the strong policy against importing conditions into irrevocable letters of credit. *See Slamans v. First National Bank of Okmulgee,* 69 F.3d 468, 474 (10th Cir.1995) (applying Oklahoma law). *See also Offshore Trading Company, Inc. v. Citizens National Bank of Fort Scott,* 650 F.Supp. 1487 (D.Kan.1987). Acceding to plaintiff's arguments would fly in the face of this strong policy.

The facts establish that Michaud never relied to his detriment on the content or character of the bill of lading prepared by Emery on September 26, 2000. Summary judgment is appropriate.

Finally, the court notes that Michaud has filed a surreply in opposition to Emery's motion for summary judgment. "An answer to a reply constitutes a surreply, which the court will not consider. The local rules do not contemplate the filing of surreplies. D.Kan.R. 7.1. The courts in this district do not permit a surreply without leave of the court." *Stevens v. United*

*States,* No. 00–3258–JTM, 2002 WL 1156027, at \*1 (D.Kan. May 20, 2002). *See also Patterson v. Lansing,* No. 99–3250–JTM, 2001 WL 946181 (D.Kan. Aug.10, 2001) (granting motion to strike surreply filed without either prior request by movant or permission from the court); *IMC Chemicals, Inc. v. Niro, Inc.,* 95 F.Supp.2d 1198, 1214 (D.Kan.2000) (refusing request to file surreply, noting those pleadings "are disfavored, and there are no exceptional circumstances compelling the filing of such a pleading in this matter"). Dkt. No. 76 is hereby stricken.

With respect to the motion against the Australian defendants, plaintiffs' Motion for Summary Judgment is hereby granted. That motion was filed June 7, 2002. On August 30, 2002, the court entered an order requiring the Australian defendants to obtain counsel and enter an appearance by September 30, 2002. The court specifically stated that if such an appearance was not made, "the court will impose sanctions, which may include the granting of plaintiffs' motion for summary judgment. No extension of time to obtain counsel will be granted." (Dkt. No. 53, at 1). Pursuant to both the previous order of this court and to D.Kan. Rule 7.4, plaintiffs' Motion for Summary Judgment against the Australian defendants is hereby granted.

IT IS ACCORDINGLY ORDERED this _____ day of February, 2003, that the Motion for Summary Judgment of Defendant Emery (Dkt. No. 66) is hereby granted. Emery's Motion to Stay (Dkt. No. 40) and Plaintiffs' Motion for Summary Judgment against Emery (Dkt. No. 65) are denied. Dkt. No. 76 is hereby stricken. Plaintiffs' Motion for Summary Judgment against the Australian defendants (Dkt. No. 29) is granted.